IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**MARGARET PETTAWAY,**
   **Plaintiff,**

v.               Case No: 3:08cv437/RV/MD

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
   **Defendant.**

_____

**REPORT AND RECOMMENDATION**

  This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Pettaway's applications for disability insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Act.

  Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

This case was originally filed in this court under case no. 3:02cv343/RV/MD. On March 11, 2003, before an answer was filed, the Commissioner requested that the case be remanded after agency counsel recommended that the Appeals Council reconsider the original decision. This court granted the request and remanded the case (no. 3:02cv343, docs. 12, 18). The matter was on remand for more than five years. During that time an administrative law judge (ALJ) entered two unfavorable decisions, both of which were reversed and remanded by the Appeals Council. While the case was still on remand from this court, counsel for the plaintiff sought leave to withdraw, which was granted (*id.*, docs. 27-28).

On October 24, 2007, after another hearing, the ALJ entered an unfavorable decision (tr. 581-98), and this time the Appeals Council declined review (tr. 574-75). The Commissioner has therefore made a final decision, and the matter is subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).

The Commissioner filed his answer on August 8, 2008 (case no. 3:02cv343, doc. 35). Given the age of the case, the original docket was closed and the case was reopened under the current case number, 3:08cv437, and the plaintiff, now proceeding *pro se*, filed her memorandum in support of her position on November 17, 2008 (case no. 3:08cv437, doc. 6). The Commissioner filed his memorandum in support on December 17, 2008 (*id.*, doc. 8).

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that Ms. Pettaway had severe impairments of (1) fibromyalgia, (2) lumbar disc disease, (3) arthritis, (4) obesity, and (5) depression, but that she did not have an impairment or combination of impairments that met or equaled one of the impairments listed in 20 C. F. R. Part

404, Subpart P; that she was unable to perform her prior relevant work; that she was 34 years old with a high school education; that she had the residual functional capacity to do unskilled light work with some limitations; that based on testimony from a vocational expert there were a significant number of jobs in the economy that she could perform; and that she was not under a disability as defined in the Act.

## STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid.  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002).  Failure to either apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal.  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The court must also determine whether the ALJ's decision is supported by substantial evidence.  *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).  Even if the proof preponderates against the Commissioner's decision, if supported by substantial evidence, it must be affirmed.  *Ingram*, 496 F.3d at 1260; *Miles*, 84 F.3d at 1400.  Substantial evidence is more than a scintilla but less than a preponderance, and encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion.  *Moore*, 405 F.3d at 1211 (citation omitted).  In determining whether substantial evidence exists, the court  must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision.

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence. *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). Findings of fact of the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The social security regulations establish a five-step evaluation process to analyze claims for both SSI and disability insurance benefits. *See Moore,* 405 F.3d at 1211; 20 C.F.R. § 416.912 (2005) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2005) (five-step determination for DIB). A finding of disability or no disability at any step renders further evaluation unnecessary. The steps are:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairment?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent any other work?

These regulations place a very heavy burden on the claimant to demonstrate both a qualifying impairment or disability and an inability to perform past relevant work. *Moore*, 405 F.3d at 1211 (citing *Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir.1985)).  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987).  If the Commissioner carries this burden, claimant must prove that she cannot perform the work suggested by the Commissioner.  *Doughty,* 245 F.3d at 1278 n.2; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

Ms. Pettaway was involved in an motor vehicle accident in 1993.  From then until 2005 she periodically sought routine medical care and medication for back problems, fibromyalgia, and depression from M. Hakima, M.D., a general practitioner (tr. 424-84, 793-99, 852-63).  Several times during treatment, Dr. Hakima encouraged Ms. Pettaway to increase her activity level, recommending that she swim or otherwise increase her exercise (tr. 448, 450).  Dr. Hakima also referred Ms. Pettaway to different specialists.

In April 1996, Ms. Pettaway saw Diana Harris, M.D., a rheumatologist. Physical examination was remarkable for generalized tenderness in the back muscles and extremities.  Dr. Harris felt that Ms. Pettaway "probably had fibromyalgia."  (Tr. 376-77).  In September 1996, Cesar Llanera, M.D., a pain management specialist, reported that a magnetic resonance imaging (MRI) scan showed mild bulging of three lumbar discs, slight narrowing at L4-5, and some straightening of normal curvature of the spine.  Ms. Pettaway exhibited normal gait and negative straight leg raising test results, however, and exhibited no sensory or motor deficits.  Physical examination

showed some tenderness on palpation in the lumbar spine and decreased forward range of motion. Dr. Llanera suggested nerve block injections, but when one injection provided no relief, he referred Ms. Pettaway for psychiatric treatment (tr. 383-85).

John Duffy, Ph.D., a psychologist, evaluated Ms. Pettaway in December 1996 at the request of Ms. Pettaway's attorney.  Mental status examination showed depressed mood and slowed mental processing, but intact memory and thought processes. Ms. Pettaway reported that her medication for depression decreased her symptoms.  Dr. Duffy's diagnosis was major depressive disorder.  He completed a questionnaire concerning Ms. Pettaway's mental residual functional capacity, and opined that she had moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; frequent deficiencies in concentration, persistence, or pace that would result in non-timely completion of tasks; and no episodes of decompensation.  He opined that Ms. Pettaway would have marked limitations in dealing with instructions in a work setting, but only moderate difficulties responding appropriately to supervisors or co-workers and performing simple or repetitive tasks (tr. 391-94).

In the fall of 1997, David Fairleigh, M.D., treated Ms. Pettaway's back problems with steroid injections and "conservative care."  (Tr. 415-23).  In August 1997, his physical examination showed normal gait, full range of motion in the back and neck, "near full" range of motion in the upper extremities, and no motor deficits (tr. 422).

From April through November 1998, Anju Garg, M.D., and P.K. Garg, M.D., provided treatment for Ms. Pettaway's lower back pain, prescribed medication, and diagnosed lower back pain, fibromyalgia, depression, and carpal tunnel syndrome. However, physical examination results throughout were normal except for occasional muscle tenderness.  Results of nerve conduction studies of both upper extremities and hands in September 1998 were also normal (tr. 518-32, 559).

In June 1998, Andrew Gygi, M.D., an orthopedic surgeon, evaluated Ms. Pettaway and concluded that her symptoms were more compatible with fibromyalgia than with nerve root irritation or disc pathology.  Physical examination disclosed predominantly normal gait and stance, no spasm, no trigger points, and full range of motion of the upper extremities and of all major joints.  Dr. Gygi felt that surgical intervention was not indicated and that additional nerve blocks would be unlikely to provide a benefit.  He recommended that Ms. Pettaway "direct her efforts towards improving her physical condition with weight loss, generalized strengthening exercise, and concentrating on becoming more active."  (Tr. 485-87).

In the following month, Richard Doll, Ph.D., a psychologist, performed a consultative examination.  He reported no serious deficiencies in concentration or persistence.  Mental status examination showed cooperative attitude, good eye contact, good memory, mildly depressed mood, and thought processes of average verbal intelligence, and Ms. Pettaway displayed "no deterioration in grooming."  She showed no difficulty with gait or coordination. Dr. Doll reported that Ms. Pettaway stated her depression medication was helpful, and that her daily activities included shopping for groceries, doing housecleaning chores, preparing meals, reading, watching television, handling her own personal care, socializing with a few friends, and occasionally attending church.  He concluded that Ms. Pettaway had "fair to good" ability to do work-related activities relating to capacity for understanding and memory, sustained concentration and persistence, and social interaction and adaptation.  Dr. Doll's diagnosis was depressive disorder, but he felt that Ms. Pettaway's "major problems are physical in nature. "  (Tr. 488-90).

In early 1999, another psychologist, Frank Brown, Ph.D., examined Ms. Pettaway.  His examination showed clear speech, good memory, good hygiene, and logical thought processes.  He noted that Ms. Pettaway "was not at all forthcoming describing her activities of daily living," but disclosed that she had married in 1998,

handled her own personal care, kept up with the news, talked with and drove to visit family members, prepared meals, and attended church. She also indicated that her medication alleviated some of her symptoms. Dr. Brown's diagnosis was major depression of moderate severity (tr. 543-46).

Three months after Dr. Brown's assessment, in May 1999, Dr. Hakima assessed Ms. Pettaway's residual physical functioning, concluding that in an 8-hour workday, she could sit for a total of 3 hours and stand or walk for a total of 2 hours; could lift and carry up to 5 pounds frequently and 10 pounds occasionally; could occasionally bend, climb, and reach, but never squat or crawl; and was mildly restricted in her activities involving unprotected heights and moving machinery but moderately restricted in activities involving marked changes in temperature and humidity, driving, and exposure to dust, fumes, or gases (Tr. 548). On a pain questionnaire also completed in May 1999, Dr. Hakima assessed Ms. Pettaway's pain as "distracting [to the] adequate performance of work activities" and concluded that her medication side effects could "be expected to be severe and limit [Ms. Pettaway's] effectiveness" at work-related activities (Tr. 549).

Nearly five years later, in January 2004, Dr. Hakima re-assessed Ms. Pettaway's physical functional abilities, and, similar to the 1999 evaluation, opined that in an 8-hour workday, Ms. Pettaway could sit for a total of 3 hours and stand or walk for a total of 2 hours; could lift and carry up to 10 pounds occasionally; could occasionally bend, climb, and reach, but never squat or crawl; and was mildly restricted in her activities involving unprotected heights and moving machinery but moderately restricted in activities involving marked changes in temperature and humidity, driving, and exposure to dust, fumes, or gases. Dr. Hakima also felt that Ms. Pettaway could not engage in repetitive actions of grasping, pushing or pulling, fine manipulation, or using leg controls (Tr. 791). On a January 2004 pain questionnaire, Dr. Hakima assessed Ms. Pettaway's pain as "present and found to

be intractable and virtually incapacitating to this individual" and opined that she was "totally restricted and thus unable to function at a productive level of work as a result of medications." (Tr. 792).

Approximately one year later, in April 2005, Dr. Hakima completed another mental residual mental capacity questionnaire. This questionnaire reflected that Ms. Pettaway's restrictions were "marked" in activities of daily living, in maintaining social functioning, in concentration, persistence, and pace, and in episodes of deterioration or decompensation , as were her abilities to understand, carry out, and remember instructions in a work setting and to respond appropriately to co-workers and supervisors.  Dr. Hakima concluded that her limitations in performing simple tasks in a work setting were "moderate," but "extreme" in her ability to perform repetitive tasks (tr. 803-04). On a pain questionnaire completed the same month, Dr. Hakima concluded that Ms. Pettaway's pain was "distracting [to the] adequate performance of work activities" and that her medication side effects could "be expected to be severe and limit [Ms. Pettaway's] effectiveness" at work-related activities (tr. 853).

In July 2005, Dr. Doll re-evaluated Ms. Pettaway, and again diagnosed depression.  Mental status examination showed cooperative attitude, good eye contact, good memory, and mildly depressed mood.  Thought processes showed average verbal intelligence, and Ms. Pettaway still displayed "no deterioration in grooming."  She showed slow gait but no problems with coordination. Daily activities were similar to those in the 1999 evaluation - Ms. Pettaway reported she cleaned her house, cooked, watched television, shopped, drove, prepared meals, attended church, and handled her own personal care.  Her activities were "performed in a normal manner" and "without special support."  Dr. Doll again concluded that Ms. Pettaway had "fair to good" ability to do work-related activities relating to capacity for understanding and memory, sustained concentration and

persistence, and social interaction and adaptation, noting on an attached form that her abilities for handling instructions and interacting with others in a work setting were not affected by her impairment (tr. 805-10).

Dale Johns, M.D., a neurosurgeon, examined Ms. Pettaway in August 2005. Physical examination disclosed full range of motion in all joints except for a mild restriction in the low back, full range of motion in all extremities, normal lordotic curve of the lower back, and straight leg raising test reports of discomfort but no radicular pain. Neurological examination showed normal speech, normal motor strength, and essentially intact sensory test results. Dr. Johns observed no clinical evidence of fibromyalgia or cervical or lumbar radiculopathy, and diagnosed possible chronic cervical and lumbar strain. The neurosurgeon found no evidence of neurological deficit. Dr. Johns concluded that Ms. Pettaway had almost no physical limitations, finding only that she should limit activities such as climbing and crawling to an occasional basis (tr. 811-18).

Orthopedic surgeon C. W. Koulisis, M.D., evaluated Ms. Pettaway in September 2005 and concluded that she "maintaine[ed] full range of motion, [and was] neurologically intact." Physical examination showed normal gait, full motor strength, and a variety of negative test results, including negative results for carpal tunnel syndrome. X-rays were normal and range of motion was full in all areas except knee flexion. Dr. Koulisis assessed no musculoskeletal limitations (tr. 821-30).

In April 2006, Jack Evans, M.D., a specialist in internal medicine, reviewed the medical evidence of record to respond to interrogatories as a medical expert familiar with the Social Security Administration disability standards, and concluded that Ms. Pettaway was able to work at the light exertional level. Dr. Evans summarized the medical evidence, noting the lack of significant physical findings, aside from tenderness, in any of the records. He acknowledged that fibromyalgia may show few

physical findings, but he also observed that the only doctor, treating or otherwise, to find a significant impairment was Dr. Hakima, and he noted that her opinion was based more on Ms. Pettaway's subjective complaints than objective medical evidence. Dr. Evans concluded that Ms. Pettaway was not as limited as Dr. Hakima's assessments suggested, and that she could do work at the light exertional level, with some mild postural and environmental limitations (tr. 832-50).

In June 2006, Dr. Hakima again completed questionnaires about Ms. Pettaway's residual mental and physical capacity and pain. Dr. Hakima opined that plaintiff had marked limitations in her mental abilities in understanding, carrying out, and remembering instructions in a work setting, in responding appropriately to co-workers and supervisors, and in performing simple or repetitive tasks in a work setting. She opined that Ms. Pettaway could lift and carry up to 10 pounds occasionally; could occasionally bend, climb, squat and reach, but never crawl; could not engage in repetitive actions of grasping, pushing or pulling, fine manipulation, or using leg controls; was mildly restricted in her driving activities; and was moderately restricted in her activities involving unprotected heights, moving machinery, marked changes in temperature and humidity, and exposure to dust, fumes, or gases. Dr. Hakima opined that in an eight-hour workday, Ms. Pettaway could sit for only one hour and stand or walk for only one hour; that her pain was "present and found to be intractable and virtually incapacitating to this individual[;]" and she was "totally restricted and thus unable to function at a productive level of work as a result of medications." (Tr. 864-67).

Prior to the administrative hearing, John Davis, Ph.D., a psychologist, completed a mental residual functional capacity form based on a review of the record evidence. He concluded that Ms. Pettaway was only mildly limited in activities of daily living, moderately limited in maintaining social functioning and in maintaining concentration, persistence, or pace, and had no episodes of

decompensation. He suggested no significant limitations in work-related mental activities except for moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining attention, concentration, regular attendance, punctuality within customary tolerance, and performing activities within a schedule (tr. 869-71, 875, 892-93).

## HEARING TESTIMONY

At the administrative hearing held on September 12, 2007, Ms. Pettaway testified that she lived alone and was not receiving treatment for her medical conditions because she currently did not have the money. She explained that she had a multi-year gap in treatment for her impairments for the same reason, although she returned to her doctor "when I got married . . . and when my son was helping me pay for it." (Tr. 882-83). She took only over-the-counter pain medication. She had not looked for a new job since 1995 because of her back, leg, and hand problems, which included constant pain (tr. 877-91).

Dr. Davis provided expert mental health testimony during the hearing, outlining his conclusion based on the medical and psychological evidence and testimony that Ms. Pettaway's impairments did not meet or equal a listed impairment. Dr. Davis felt that Ms. Pettaway's depression was generally secondary to her general medical conditions (tr. 889-93). Bruce Witkind, M.D., a neurosurgeon, also provided medical expert testimony during the hearing based on the medical evidence and Ms. Pettaway's testimony. He believed that Dr. Hakima's restrictions were in conflict with the other medical evidence, and that Ms. Pettaway's impairments did not meet or equal a listed impairment (tr. 895-900).

The ALJ posed a hypothetical question to the vocational expert that assumed an individual of Ms. Pettaway's age, education, and work history. Such an individual could perform unskilled work at the light exertional level; with additional moderate

limitations in understanding, remembering, and carrying out detailed instructions; in maintaining attention and concentration for extended periods; in performing activities within a schedule; and in maintaining attendance and punctuality. The vocational expert testified that in his opinion such a person could do the unskilled, light exertional-level jobs of bench assembler, non-postal mail clerk, and cleaner/housekeeper, and the unskilled, sedentary exertional-level work of order clerk, credit card solicitor, and bench assembler (tr. 902-04).

## DISCUSSION

Ms. Pettaway argues that the ALJ was biased against her both because he was reversed by the Appeals Council and because of her race. The undersigned has carefully reviewed the entire record, and can find no evidence of bias. Ms. Pettaway has pointed to nothing specific in support of her claim, so her contention is based purely on her apparent assumption that because the ALJ was reversed by the Appeals Council and then ruled against her, and because she is African American, he must have been biased. That by itself is insufficient to support a finding of bias, particularly in light of the fact that the Appeals Council did not reverse the decision under consideration here, so Ms. Pettaway is not entitled to reversal on that ground.

Her argument that the Commissioner and the ALJ disobeyed this court's remand order is also unsupported. As noted above, the case was originally remanded at the Commissioner's request before an answer was filed as provided by sentence six of 42 U.S.C. § 405(g). Contrary to Ms. Pettaway's apparent belief, this court did not order the Commissioner to find that she was disabled or to award her benefits. Rather, the court merely ordered the Commissioner, as he requested, to remand the case to the Appeals Council "for further proceedings" to consider all Ms. Pettaway's severe impairments, elicit testimony from a vocational expert, and address her subjective complaints of pain in accordance with the Eleventh Circuit's

pain standard (case no. 3:02cv343, doc. 18).  That is what the Commissioner did. This court did not tell the Commissioner to find in Ms. Pettaway's favor, or to consider the evidence in her favor.  She is not entitled to reversal on that ground.

As to the merits of the claim, Ms. Pettaway is not entitled to reversal.  The thrust of her claim is that she suffers from disabling pain from her motor vehicle accident, and that the ALJ should have adopted the opinions of Dr. Hakima.

## RELEVANT LEGAL PRINCIPLES

### Treating physician opinions

Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).  "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips,* 357 F.3d at 1241; see also *Lewis,* 125 F.3d at 1440 (citing cases).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the

ALJ must nevertheless weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. 404.1527(d).

The opinion of a non-examining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician, whose opinion generally carries greater weight. *See* 20 C. F. R. § 404.1527(d)(1); *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1255 (M.D.Fla. 2005). However, a brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability. *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

"When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 352 F.3d at 1241. Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986));[1] *see also Nyberg v. Commissioner of Social Security*, 179 Fed.Appx. 589, 591 (11th Cir. 2006) (Table, text in WESTLAW)(also citing *MacGregor*).

### Subjective complaints of pain

Pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these

---

[1] *MacGregor* further held that "Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." 786 F.2d at 1053.

symptoms." *Accord* 20 C.F.R. § 416.929. The Eleventh Circuit has articulated the three-part pain standard, sometimes referred to as the *Hand*[2] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Ogranaja v. Commissioner of Social Security*, 186 Fed.Appx. 848, 2006 WL 1526062, *3+ (11th Cir. 2006) (quoting *Wilson*) (Table, text in WESTLAW); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." *Wilson, supra*, 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." *Elam*, 921 F.2d at 1215. The Eleventh Circuit has held that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)(citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)); *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1259 (M.D.Fla. 2005). However, the presence or absence of

---

[2] *Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the three-part pain standard).

evidence to support symptoms of the severity claimed is a factor that can be considered. *Marbury*, 957 at 839-840; *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, if the Commissioner refuses to credit subjective testimony of the plaintiff concerning pain he must do so explicitly and give reasons for that decision. *MacGregor v. Bowen*, 786 F.2d at 1054. Where he fails to do so, the Eleventh Circuit has stated that it would hold as a matter of law that the testimony is accepted as true. *Holt v. Sullivan*, 921 F.2d at 1223; *MacGregor v. Bowen*, 786 F.2d at 1054. Although the Eleventh Circuit does not require an explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted). And of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. *Wilson*, 284 F.3d at 1225-1226; *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F.Supp.2d at 1259.

Underlying the *Hand* standard is the need for a credibility determination concerning a plaintiff's complaints of pain. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms

and complaints").[3]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  *Hand, supra,* at 1548-49.  It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] allege[s] [is] credible when considered in the light of other evidence."  *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984).  Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

## DISCUSSION

Dr. Hakima's opinions undoubtedly support Ms. Pettaway's claim for disability benefits, but the ALJ was not required to accept those opinions as binding.  Rather, the ALJ was required to look at all the evidence in making his disability determination, and that is what he did.  He explained in detail his reasons for discounting Dr. Hakima's opinion: Dr. Hakima's opinion was based almost entirely on Ms. Pettaway's subjective complaints of pain and not on any objective test; all x-ray and other imaging and nerve conduction studies were essentially normal except for mild bulging in the low back; every other medical professional who either examined Ms. Pettaway or examined the medical record found no significant objective evidence of disability; there was a years-long gap in treatment, and

---

[3] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

*Case No: 3:08cv437/RV/MD*

although Ms. Pettaway testified that she lacked funds for treatment, it did not go unnoticed that she stopped seeing her doctor after settling the lawsuit arising out of her motor vehicle accident, and finally returned to Dr. Hakima shortly before the hearing; and the mental health professionals who examined Ms. Pettaway or examined the record found that she was depressed, but not so depressed as to be unable to work (tr. 584-95).

In making his determination the ALJ considered all the evidence. It was clearly within his "realm of judging" to make a credibility determination from these facts, and he did so, finding that Ms. Pettaway's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 592). The ALJ's findings overall were supported by substantial record evidence. He did not improperly reject the opinion of Dr. Hakima, and he did not improperly reject Ms. Pettaway's subjective complaints of pain.

Accordingly, it is respectfully RECOMMENDED that the Commissioner's decision be AFFIRMED, that judgment be entered in favor of the defendant, and that the clerk be directed to close the file.

At Pensacola, Florida this 16th day of March, 2009.

/s/ *Miles Davis*
    **MILES DAVIS**
    **UNITED STATES MAGISTRATE JUDGE**

*Page 20 of 20*

## NOTICE TO PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636;** *United States v. Roberts***, 858 F.2d 698, 701 (11th Cir. 1988).**

*Case No: 3:08cv437/RV/MD*